CALVIN O. GEER

*v.*

AMALGAMATED COPPER COMPANY.

[Submitted May 11th, 1901. Decided May 16th, 1901.
Filed June 4th, 1901.]

A stockholder in a mining corporation sought to restrain the company from purchasing the stock of two other companies located in the same district, averring that the price at which the stock of such companies was to be absorbed was grossly excessive; that the companies were engaged in numerous and heavy litigations involving many millions of dollars; that some of the officers and directors in defendant company were largely interested in the other companies. Affidavits were presented by complainant as to the value of the stock of such companies, to show the excessiveness of the price to be paid for the stock; but such affidavits gave no lists of the properties owned by either of the companies, or any estimates of the amount of ores therein. Defendant company presented affidavits showing that the properties were especially valuable to it, and that the stocks of such companies had a market value

Geer v. Amalgamated Copper Co.

greater than that at which it was alleged they were to be purchased, and the companies paid regular dividends. The directors alleged to be interested in the companies were without power to purchase the stock without the consent of the stockholders in defendant company. Complainant owned a small fraction of the stock of the company, and the majority of the stockholders did not object to the proposed purchase.—*Held*, that an injunction to restrain the proposed purchase should be denied.

On hearing on order to show cause why injunction should not issue. Heard on bill and affidavits, and answer and affidavits.

*Mr. Isaac S. Taylor, Mr. J. Flavel McGee* and *Mr. Franklin Bien* (of the New York bar), for the complainant.

*Mr. Richard V. Lindabury, Mr. Charles L. Corbin* and *Mr. John A. Garver* (of the New York bar), for the defendant.

PITNEY, V. C.

The complainant, Calvin O. Geer, is the owner of one hundred and four shares, of $100 each, of the capital stock of the defendant, the Amalgamated Copper Company, and, by his bill, filed April 25th, 1901, seeks to restrain the said company from purchasing any of the capital stock of two mining companies, namely, the Boston and Montana Consolidated Copper and Silver Mining Company, a body corporate of the State of Montana, and usually designated as the Boston and Montana company, and the Butte and Boston Consolidated Mining Company, a corporation of the State of New York, commonly known as the Butte and Boston company.

The allegation of the bill is that the defendant company contemplates purchasing a large quantity, two-thirds at least, of the stock of each of the said last-mentioned companies, at an extravagant price, and paying therefor either in cash or by issuing therefor its own capital stock.

The statement of the bill is that the authorized stock of the Boston and Montana company consists of one hundred and fifty thousand shares, of the par value of $25 each, making a total of $3,750,000, all of which has been issued, and that the author-

ized capital stock of the Butte and Boston company is two hundred thousand shares, of the par value of $10 each, making a total of $2,000,000, all of which has been issued, and that the intention on the part of the defendant company is to purchase the Boston and Montana stock at $375 a share, which is equivalent to one thousand and five hundred per cent. of its par value, or fifteen to one, and the Butte and Boston at the rate of $92.50 per share, which is at the rate of nine hundred and twenty-five per cent., or nine and a quarter to one.

It then proceeds to state the value of these two stocks as follows: That, by a printed and published report of the Boston and Montana company, dated December 31st, 1900, its whole cash assets were $5,666,000, and that its outstanding bonded indebtedness was $600,000, leaving a net total of valuation of a little over five million dollars; and that the price at which the defendant proposes to purchase it is $56,000,000.

It then states that the company is involved in numerous and heavy litigations in the State of Montana, and that, in one case, the amount involved is between three and four million dollars, besides other litigations in that state.

The bill further states that it is noticeable that, by its report of December 31st, 1900, *there is no mention among its assets of any real estate,*

"and your orator is not informed as to whether or not the said company claims ownership of any mines or mining tracts or merely operates mines of other parties—but it is nevertheless a fact, that it has come to the complainant's knowledge"

that it has been prevented, by injunctions, from operating several of the mines which it had previously operated. And then follows the allegation that the purchase of the stock of the Boston and Montana company, on the basis of its being worth $375 a share, would be grossly excessive, and would be an unconscionable expenditure, without any even approximate value to be received therefor, and would be unwarranted by any reasonable care or conservation of the rights and interests of the stockholders of the Amalgamated Copper Company, and would, in fact, be in actual fraud thereon, and especially so as to those

stockholders of the defendant company who are not stockholders of the said Boston and Montana company.

With regard to the Butte and Boston company, the bill alleges that it owns, or claims to own, mining rights or properties in the State of Montana, but to what extent or actual value the complainant is not specifically informed, but that it was formerly capitalized at $5,000,000; that in 1897 its capital was reduced to $2,000,000, which reduction was made after it had passed through the hands of a receiver, and after its entire properties had been sold by the receiver and bought in by a reorganization committee for the sum of $1,000,000; that no additions to its holdings or properties since that time have been made, as far as complainant is informed and believes to be true, unless it be one or a very few inconsiderable and unprofitable additions of doubtful value.

That the company has never paid any dividends, except one dividend in December, 1900, of $1,000,000, or fifty per cent. on its capital stock, which dividend was evidently never earned.

"That the properties of the said company are largely in present litigation—or rather the alleged title or rights of the said company in and to the mining properties operated by it in Montana are in litigation, and that the said company is now involved in numerous and heavy lawsuits which threaten the tenure of said properties by the said company."

That the smelting works of said company, in Montana, are poorly located and arranged, and not adapted to the proper handling of ores economically or profitably. That $2,000,000 cash for new stock has been paid in, which has been largely dissipated in unsuccessful efforts to locate and open up new mines or new bodies of ore. That the company has a bonded indebtedness of $1,000,000. The bill then makes the same allegation of the grossly excessive and unconscionable expenditure which would be involved in paying this company at the rate of $92.50 per share, namely, $18,500,000, that it makes with regard to the Boston and Montana proposed purchase; and then is added, that the acquisition of the stocks of the two companies would inevitably involve the Amalgamated Cop-

Geer *v.* Amalgamated Copper Co.

per Company in all of the uncertain, desperate and costly litigations in which the said two companies are now involved.

The defendant company was organized in April, 1899, and its certificate of organization authorizes the issue of $75,000,000 of stock, divided into seven hundred and fifty thousand shares, all of which has been issued. The certificate of organization is liberal and comprehensive, authorizing the company to engage in almost every possible enterprise; but it has heretofore been exercised only in the direction of, and its business, past and present, is the buying and holding the shares of stock of certain mining companies engaged in the mining of copper ore in or near Butte, Silver Bow county, Montana. Through the ownership of these stocks it controls the operations of those companies. It sufficiently appears that it controls the stock of several large and prosperous companies owning mines located near each other and near the mines of the Boston and Montana and the Butte and Boston companies, in or near the city of Butte.

The further allegation of the bill is that three of the officers and directors of the defendant company, to wit, Henry H. Rogers, William G. Rockefeller and Albert C. Burrage, are also directors and officers in the Butte and Boston company, and are personally interested as large stockholders of the latter company and also of the Boston and Montana company, in promoting and carrying through the purchase by the defendant company of the capital stock of those companies.

In support of the allegation of intention found in his bill, the complaint sets out a communication dated April 15th, 1901, addressed to the directors of the Butte and Boston company, signed by Kidder, Peabody & Company, bankers and brokers, of Boston, Massachusetts, in which they state that they have been requested to undertake to formulate and carry out a plan for the exchange of shares of the Butte and Boston company for those of the Amalgamated Copper Company upon some equitable basis; that it will be necessary, in order to accomplish this result, to have one hundred and thirty-five thousand shares of the Butte and Boston company deposited with them. Then it states the proposition to be that in the exchange the Butte and Boston stock is to be rated at $92.50 per share. This

communication was forwarded by the officers of the Butte and Boston company to its stockholders.

In addition to the circular just referred to, the complainant's bill sets out another circular issued to the stockholders of the Boston and Montana company by its president—a Mr. Bigelow —and directors, in which they state that they have received from Kidder, Peabody & Company a statement that they are about to undertake to formulate and carry out a plan for the exchange of shares of the Boston and Montana company for those of the defendant company on some equitable basis, and that the proposition is to count the Boston and Montana stock as worth $375 per share.

These circulars were set out at length, and it was argued by complainant that they amount to a cash offer by Kidder, Peabody & Company of the prices named, if the aggregate amount of stock was deposited; and hence it was argued, Kidder, Peabody & Company must have been assured by the defendant corporation that their offer would be accepted by it. But a careful reading of the document does not, in my judgment, support such construction and interference.

Two affidavits were annexed to the bill: one made by the complainant himself, stating that he saw a notice of the proposition of Kidder, Peabody & Company, which was dated and issued on the 15th of April in a newspaper published in Boston, of the issue of April 20th; and that he had received no notice whatever as a stockholder of the Amalgamated Copper Company of any such proposed purchase.

Another affidavit is that of Mr. Stanley Gifford, who swears that he is a mining engineer by profession, is acquainted in a general way with the property of the Montana and Boston and the Butte and Boston mining companies situate in Montana, and that he is well informed as to the value of mining rights in Butte and its vicinity. And, as to the Boston and Montana company, he swears in a general way that it is involved in numerous and heavy litigations in the State of Montana, involving title to a large part of its property and to pecuniary claims against it to a large amount. He does not make any statement of the mining properties claimed by it, or their

24

respective or collective values, nor does he state what has been its earnings or earning capacity; but says that by a printed report of the condition of the company, dated December 31st, 1900 (that before referred to), it appears that the total balance of assets at that date, of that company was, in round figures, $5,666,000, and that its outstanding bonded indebtedness was $600,000. He further says, as to the Butte and Boston company, that it was reorganized in 1897, in which a sale of all the property and assets of the old company was made at the sum and price of $1,000,000, and bought by the chairman of the reorganization committee of the new company; and that it has paid only one dividend, namely, in the month of December, 1900, $1,000,000, or fifty per cent. He does not give any statement of its mining properties, or their value, but says that the property of that company is very much in litigation. He says the smelting works of the company are poorly located and arranged, and cannot serve their purpose, and therefore are not adapted to the most economical or profitable service. He says that the Butte and Boston company has a bonded indebtedness of $1,000,000. Further, that he knows of no advantage to the stockholders of the Amalgamated Copper Company who are not stockholders of the other two companies which could be gained by acquisition of the stock of the other two companies. The affidavit proceeds as follows:

"Deponent further says that $92.50 per share for the stock of said Butte and Boston Consolidated Mining Company—or $18,500,000 for its entire capital stock—is a most excessive and grossly exorbitant price or valuation for the same, and that the price of three hundred and seventy-five dollars per share for the stock of the Boston and Montana Consolidated Copper and Silver Mining Company—or $56,250,000 for the whole of the stock of said company—is a most excessive and grossly exorbitant price or valuation for the same, and that neither of said prices or valuations for said respective stocks can in the opinion of deponent be justified.

"Deponent further says that the proposition that the Amalgamated Copper Company should take over or acquire the stock of the said two other companies at the figures above stated, or at any figures in approximation thereto is, in his opinion a most preposterous proposition, and in fact incredible without the assumption of fraudulent motives."

· · Upon presentation of· the bill and ·those affidavits, ·an order to show cause, with interim restraint,· was made, returnable on May 6th, with leave to the complainant to ·serve other affidavits not later than the 1st day of May.

· Acting :under that leave, the complainant· served ·· on the defendant certain supplemental affidavits, by one of. which it appears that a circular had been issued by Kidder, Peabody & Company stating that ninety per cent. of the stock of both companies had been already deposited with them under the terms of their circular of April 15th, 1901, and that they had extended the time for depositing shares until the 2d of May.

Another affidavit so served is that of Mr. Franklin Bien, a counsellor-at-law of New York, who appeared also as counsel for the complainant herein at the hearing, in which he swears that he is well acquainted with the property of the two mining companies in Silver Bow county, Montana, and with the character of their titles. But he does not give any list or statement of them or their values, or productive capacity. He sets out at length a series of litigations which are being carried on against those companies and also the defendant in Montana.

Another affidavit so served is that of Mr. Roberts, clerk of the district court of the second judicial district of Montana, giving a list of some ten or a dozen suits pending in that court against .the Boston and Montana and the Butte and Boston companies, all but one against the Boston and Montana company.

The bill prayed for answer in this wise:·

"To the end that the said Amalgamated Copper Company may according to law full, true and perfect answer make to all and singular the matters and things hereinbefore stated, and that as particularly as if the same were here again repeated, and the said company, its officers and directors or either of them thereunto interrogated, paragraph by paragraph."

On May 6th, the return day of the order, the· defendant company answered· under the seal of the company, attested by the vice-president, Henry H. Rogers, and the secretary, William G. Rockefeller; and the answer was taken first before Walter

F. Livingston, a notary public of New York, and next before Charles L. Corbin, master in chancery of New Jersey, and to it is appended this affidavit:

"Henry H. Rogers, being duly sworn, on his oath, says: I am vice president and acting president of the defendant company. I have read the foregoing answer, and the matters and things therein set forth, so far as they relate to my own acts and the acts of the said company, are true, and as far as they relate to the acts of others, I believe them to be true."

The effect of the answer is that the officers of the defendant company are of the opinion that it is to their advantage, for reasons therein set forth, that they should buy a controlling interest in the stock of the Butte and Boston and the Boston and Montana companies, if it can be done at a fair price; but the answer denies that the officers were responsible in any way for the circular sent out by Kidder, Peabody & Company, and it denies that they have ever made any offer to Kidder, Peabody & Company, or authorized them to make any offer for the stock of the two companies, at any price whatever.

It denies that the defendant, or its officers or directors, have formed any definite plan, or any plan whatever, for absorbing or taking over the stock or properties of either the Boston and Montana company or the Butte and Boston company, by the payment of the sum of $375 per share for the stock of the Boston and Montana and $92.50 per share for the stock of the Butte and Boston company, or any other sum, either in cash or in stock; or that the proposals to the stockholders of the said two companies made by Kidder, Peabody & Company show a willingness on the part of the defendant company to pay the said amounts, respectively, or any other amount or amounts.

It denies that the acquisition of the stocks of those companies at the price named would be excessive or would be an unconscionable expenditure, and denies that it would not be an approximate value to be received therefor, or that it would be unwarranted by any reasonable care or conservation of the rights and interests of the stockholders of the defendant company, as alleged in the bill.

Geer *v.* Amalgamated Copper Co.

The answer avers that the market value of the stock of the Boston and Montana company is now, and for a considerable time has been, greater than $375 per share, and that it is now selling on the New York and Boston Exchanges at $450 a share, or thereabouts, and has not, since April 1st, 1901, sold for less than $350 per share on the Boston Exchange (where it is listed) in large quantities; and that it paid to its stockholders in dividends out of its net earnings, during the year 1899, $6,150,000, and during the year 1900, $6,450,000, and that on the 20th of February of the present year it paid its first quarterly dividend for the present year, amounting to $1,500,000, and that the mere physical property and assets of the company, leaving out of account good will and intangible assets of all kinds, have an intrinsic and market value of at least $56,250,000.

The answer says of the printed report of the Boston and Montana company, dated December 31st, 1900, mentioned in the bill, showing assets of only $5,666,000, that said report only shows, and only purports to show, the balance of its cash and quick assets, and does not include, and does not purport to include, its mines and mining rights, smelters and other properties, which are of the value of many million dollars.

The disingenuousness in this respect of the allegations of the bill and affidavits annexed thereto is clearly shown by an extract set forth in one of the defendant's affidavits taken from the very report upon which the complainant bases his allegation in that behalf, and that extract is this:

"Stockholders should bear in mind that the surplus of over $5,000,000 does not include any value for the mines and plant, Great Falls Smelting Plant, or stock in process, and that these are most substantial items."

Of its bonded debt the answer says that it is paying it as fast as it has a right to do by the terms of the bonds themselves, and could easily pay them all off at any moment if it was in the power of the company so to do.

Of the Butte and Boston company the answer says that it is the successor to the mining rights and properties of the old Butte and Boston mining company, whose property was sold at receiver's sale in 1897, and bought by a committee repre-

senting the security holders of. the said company, which committee thereupon organized the present company with a capital stock of $2,000,000. The price paid for the property of the former company was $1,000,000, but that price was a mere nominal one, as the reorganization committee represented all the security holders of the former company, and no one was in a position to bid against them at the sale. That the present capital stock of $2,000,000 was paid in in cash at the time of the organization of the company in 1897, and neither the whole nor any part of it has been dissipated, as alleged in the bill; on the contrary, that the company has expended a large part of its capital in the acquisition of. new properties and in the material development of the mines acquired at the receiver's sale, as well as in the construction of a valuable smelting plant at Butte, Montana, which is modern in its appliances, and instead of being poorly located and not adapted to the proper handling of ores, economically and profitably, as alleged in the bill, is one of the best located and most modern smelting plants in all respects in the State of Montana.

The answer denies that the dividend of $1,000,000, paid by the Butte and Boston company, in December, 1900, was paid out of capital; says that it was paid out of the net earnings of the company; and that the net earnings of the company thus far during the year 1901 have been largely in excess of those of 1900 during the same period.

The answer denies that the acquisition of the stock of the Butte and Boston company at present for the sum of $18,500,000 would be excessive or an unconscionable expenditure, or that it would be in fraud of the stockholders of the defendant company, whether they are holders of the stock of the Butte and Boston company or not; and avers, in substance, that the property of the company is of great value and warrants the price named.

It admits that Rogers, Rockefeller and Burrage, three of the seven directors of the defendant company, are also directors in the Butte and Boston company, and that some of the present board of directors of the defendant are personally interested

as stockholders in the Boston and Montana company, and others in the Butte and Boston company.

But it denies that there is a scheme on foot to unload upon the defendant company or to compel it to accept and pay for the stock of the said two Boston companies at exorbitant and excessive figures, established and fixed in fraud of the stockholders of the defendant company, without submission of the project to the stockholders of the defendant company. It denies that its directors have any intention of purchasing either of the stocks in question without first laying the scheme before its stockholders for consideration and determination by them. The language used in that respect is this:

"And although, from information obtained, the defendant's officers are of the opinion that the stock of the said companies is worth the amount mentioned in said circular letters, nevertheless the defendant would not and will not make any contract whatever with Kidder, Peabody & Co., or with anyone else, for the acquisition of the said stocks, without further and careful inquiry into their actual value, and into the actual value of the properties which they represent; nor will it, upon any consideration, purchase the said properties at any price in excess of their intrinsic or fair market value, or without the approval of its stockholders at a meeting called for that purpose."

It says that the reason why no notice has been given to the stockholders of the proposed purchase was, and is, because it was the judgment of the directors of the defendant company that it was not worth while to buy any more stock than it already owned of the two companies in question unless it could get a majority of each; that it was not to their interest to buy a majority of one stock unless they could get the majority of the other, for reasons presently to be stated; that the reason why they did not call the matter to the attention of the stockholders was that they thought it was not worth while to do so until Kidder, Peabody & Company had obtained control of the necessary majorities of both of the stocks.

The answer also deals with the allegations of the bill with regard to litigations; sets them out at length, and shows that nearly all have been promoted by the officers or employes of a corporation known as the Montana Ore Purchasing Company,

or by that company itself, of which F. Augustus Heinze and Arthur P. Heinze, John MacGinnis and Stanley Gifford (who made an affidavit annexed to the bill) are officers, and that Geer, the complainant herein, is a clerk in the employ of Heinze; and the allegations of the answer in general are that the litigations, although very annoying and expensive, have been, in the main, up to date, decided in favor of the defendants, the Butte and Boston company, the Boston and Montana company and the defendant herein, and against the plaintiffs therein.

I may stop here to say that this part of the answer is sustained by the affidavits; and it appears plainly enough that the present suit is one of a series promoted by the persons last named.

In addition to the verification of the answer made by Mr. Rogers, as vice-president, there was read at the hearing a special affidavit made by him, in which he says that he has been its principal executive officer since the death of Mr. Marcus Daly, of Montana, who was the president of the company, and that the directors are the same as when it was organized in 1899, except that William G. Rockefeller has been elected in place of Mr. Daly, and that A. R. Flower has been elected in the place of the late Governor Flower, of New York, who was an original director. His affidavit verifies the allegations of the answer in showing that no offer has ever been made by the defendant to acquire any of the stock of either of the companies, except ten thousand shares bought some time ago; that no meeting of the board of directors or executive committee of the defendant has ever been held to consider the advisability of making such offer, and no offer has been made by him individually or as vice-president, or by any one on behalf of the Amalgamated company to acquire stock of the Boston companies, or either of them. That he had an interview in April of this year with Mr. Winsor, of the firm of Kidder, Peabody & Company, in which Mr. Winsor suggested the advisability of acquiring the controlling interest in the two Boston companies, and that he told Mr. Winsor he would not advise the purchase unless they could have a majority of the stock of each company; but that he did not agree with him, on his own behalf or on behalf of

anyone else, to purchase any of the said stocks, either for cash
or in exchange for stock of the Amalgamated company, or upon
any terms whatever; nor did he suggest to him or to anybody
else the price at which the company would be willing to pur-
chase; and that he had no intention and would not think of
such a thing as purchasing or making any contract unless he
thought it would be approved by a large majority of the stock-
holders of the defendant company; that he would not do it with-
out obtaining the approval of a majority of the stockholders.

This special affidavit of Mr. Rogers is supported by the affida-
vit of Mr. Winsor, of the firm of Kidder, Peabody & Company.

Another affidavit read at the hearing was made by Mr. Fred-
erick P. Addicks, who is the assistant treasurer of the Butte
and Boston company, in which he sets out how the property
of the old company was purchased for the nominal sum of
$1,000,000, and that the present stock of $2,000,000 was issued
for cash, and that by the purchase it acquired extensive copper
mining properties for a barely nominal consideration; that a
large part of the $2,000,000 of capital, which was paid in in
cash, was spent in improving and developing its property, and
that it erected new smelting works near its mines, at a very
large expense, which it is now operating, not merely in treating
ores extracted from its own mines, but also in treating the ores
of independent miners and operators.

He further, in this affidavit, denies that the smelting works
of the Butte and Boston company are poorly located or badly
arranged, and swears that they are of the best character and
have the most modern improvements. He says that the divi-
dend of fifty per cent. paid in December, 1900, was paid exclu-
sively out of surplus earnings, after paying all expenses and
for improvements, and that, as a matter of fact, since January
1st, 1901, the net earnings of the company have largely exceeded
the net earnings for the same period in 1900. He says that the
capital stock of the Butte and Boston company is listed on the
Boston Stock Exchange, and is there dealt in very largely, and
that since the organization of the company, in 1897, there has
been a definite and well-recognized market value for the stock;
that it has been widely distributed, and much of it is held for

trust estates and by persons acting in a fiduciary capacity, and that it is recognized throughout New England as a prudent and conservative investment stock; that it is also bought and sold in New York City, though it is not listed on the New York Stock Exchange. He gives the average quotation for the week ending May 2d, 1901, as $115 a share; that in 1899 the stock was quoted as high as $108 a share; in 1900 the highest quotation of it was $96.50 a share, at which price it was sold in November of that year, it having risen to that figure from the decline which took place in December, 1899, when there was an acute and widespread financial panic, which caused a violent break in the market price of all stocks dealt in on the exchanges; that during the past six months the market price of the Butte and Boston stock has been steadily rising, and its average price for April, 1901, has exceeded $110 a share. And he verifies the allegation of the answer which gives the various fluctuations of the stock, running from $76 per share to $119 per share.

Another affidavit is made by Mr. Hyams, who is a metallurgist and mining engineer and the general manager of the works of the Boston and Montana company, and he explains and sustains the reasons set forth in the answer why it is to the advantage of the defendant company to become the owner of a majority of the stock of each of the Boston companies; and with his affidavit is a map of the locations of mining rights in the neighborhood of Butte. Those reasons are as follows: The United States Mining laws permit mining rights to be located on lands of the United States without the acquisition of the title from the United States, under certain rules. The location must be not more than so many feet long and so many feet wide. It has what is termed end lines and side lines, or, to use the language of the witness:

"Mining claims, when located, are laid out in the form of a quadrangle, end lines being parallel to each other and being limited in length, by the Revised Statutes of the United States, to 600 feet, though they need not be of the same length. The owner of the apex of a vein is limited laterally by the end lines of his claim; but if the vein passes through his claim from one end line to the other, he has the privilege of following

Geer· v. Amalgamated· Copper Co. ·

the incline of the vein through the side lines and down under the property- erties of others indefinitely. Even if the vein passes through one end of the claim and out at a side line, the owner of the apex can still follow its incline through the side lines, though, in this case, he is confined to the space between the end line and a line drawn parallel to it from the point where the vein intersects the side line." ·

The result of this is the liability to great conflict, and, in practice, to actual conflict, between mine-owners; and the questions arising are exceedingly difficult of determination and very expensive, owing (to use the language of the witness)

"to the fact that, among other things, much work in the nature of underground cross cuts, drifts and raises had to be done to expose the formation and direction of the veins for the information of the courts, and independent expert mining engineers had to be employed for this purpose."

The map, verified by this witness, shows the locations and extent of the mining claims of the Boston and Montana and the Butte and Boston companies, and of those other mining companies the majority of the stock of which is already owned by the defendant herein, and shows plainly the liability of conflict between those companies of the character above stated, and the desirability that their ownership should be, measurably at least, consolidated, so that these conflicting claims can be settled upon an equitable basis without the enormous expense involved in a judicial investigation.

Mr. Hyams further, in his affidavit, shows his knowledge of the different litigations referred to in the affidavit of Mr. Bien and in the affidavit of Mr. Roberts, the clerk of the court; and he shows, as I have already remarked, that they are, almost all of them, promoted by the gentlemen in whose employ the complainant herein is and by those who have made the affidavits sustaining the bill. These suits are directed mainly against the Boston and Montana and the defendant herein, and only one or two against the Butte and Boston.

He also proves the value of the smelting plant of the Butte and Boston company. He also sustains the allegations of the answer with regard to the market price of the shares of the two Boston companies, and shows, as one reason for their high

price, the great increase in the value of copper, which for a number of years prior to 1899 averaged between nine and a half and eleven and a half cents a pound, and has, within two or three years, risen to seventeen cents a pound; and that, by reason of the great demand for copper for the conveyance of electricity and for interior decoration and trimming, in the shape of brass and bronze, the price is likely to be maintained, and that the discovery of new copper lodes is not keeping up with the demand for the metal. He states, as another reason for the increased value of their mines, that there has been a great improvement in the methods of extracting and treating the ores, which has largely reduced the cost of production, and which tends to increase the value of the mines from which they are taken. He swears that the dividends paid on the Boston and Montana stock since 1888 have aggregated $22,475,000, and that, besides that, they have spent at least twenty million dollars in the development and improvement of its mines. And he supports the answer in the allegation that the report of the situation of the company showing only $5,600,000 of assets does not include anything more than the available cash assets over and above all fixed property.

With regard to the increased value of copper, amounting within two or three years to nearly one hundred per cent., it is apparent that the result of such a rise might render a mining plant of great value which, under the lower price, was of no value whatever. This consideration alone is sufficient to account for the great increase in the value of the Butte and Boston stock.

Another affidavit is by Mr. Clarence King, a geologist and mining engineer, apparently of great repute, who has made a study of the mines in Montana, but is not employed by either of these companies, and who swears that from the breaks and irregularities in the veins of copper ore, in the district of Butte, serious questions as to title are liable to arise at any time among the owners of adjacent and neighboring claims, and such questions will be most difficult of judicial settlement, and are likely to involve great cost and indefinite suspension of production pending litigation. He swears that he has been in the principal

Geer v. Amalgamated Copper Co.

mines of the Boston and Montana and the Butte and Boston companies and examined the veins of ore therein, and that, from his knowledge of their character and of the value of copper ores and the probable world supply of the same, and from the facts disclosed in the affidavits of Mr. Hyams and Mr. Addicks, he is of opinion that a ten years' life of the two properties is to be relied on as a fair mining certainty, and that, in view of their relation to the mines of the Amalgamated Copper Company, the defendant herein, a purchase thereof by the Amalgamated company, at a price not exceeding seventy-five million dollars, would be a wise and conservative act.

At the hearing on the 6th of May the complainant offered, and was permitted, against defendant's objection, to read three additional affidavits, namely, two made by Josiah H. Trerise and one made by George H. Robinson. That by George H. Robinson was made on April 27th; and had I observed the date I probably would not have admitted it, because it might have been received here in time to be served on the defendant prior to May 6th. Its purport is that the affiant is a mining engineer at Butte, Montana, and is familiar with the mining properties there; and it gives another resume of the various litigations over the mining claims, not only of the Butte and Boston and the Boston and Montana, but of other mining companies, the majority of whose stock is owned by the defendant herein.

One of the two affidavits made by Mr. Trerise was verified on April 30th, and is substantially a copy of that just referred to made by Mr. Robinson. The second affidavit by Mr. Trerise was made on May 1st, and in it he also swears, as do the others, of personal inspection of several of the mines owned or controlled by either the defendant herein or by the Butte and Boston and Boston and Montana. It closes by swearing that he is acquainted generally with the mining properties of the Butte and Boston, and that, in his opinion, the value of all its properties at the present time is not in excess of $1,500,000, which, after deducting the debt of $1,000,000, would leave its value at $500,000. But this affidavit resembles the other affidavits already referred to in that it gives no statement or list of the properties owned

by either of the ,mining companies, or any · estimate of · the amount of ores therein, or of the mining capacities of either.

This witness is shown to be in the employ of the Montana Ore .Purchasing Company.

The estimate just given is .the only estimate of value made by any of the affiants on the part of the complainant, and it is palpably based upon an estimate by this witness of the depreciating effect· of the various litigations referred to in the affidavits of Mr. Trerise and in the pleadings and other affidavits submitted upon the value of · the property.

I expressed the opinion at the hearing, and I still adhere to it, that I cannot permit the value of the properties of these corporations to be· affected by a mere parol statement of suits brought .and maintained against them, except so far as they have actually· interfered with the possession and working of the mines. No record of any suit was produced, and it would, in my judgment, be highly improper to permit the fact of pending litigation, proven in the way that it was attempted to be done in this cause, to be used for the purpose here intended. Besides, the affidavits on the part of the defendant tend to show. that while the litigations have been very expensive and annoying, yet, so far as they have been finally decided, · the result has been favorable to the defendants in the various suits. And the defendant argues that notwithstanding the two Boston companies—and particularly the Boston and Montana, which is much the richer of the two and been subjected to a greater number of suits:—have been prevented, by injunctions, from working some of their mines for the last two years, they have still made great earnings and been able to pay large dividends.

I have said that no detailed statement of mining claims or estimate of the values of each was given by the complainant, although their witnesses swear that they were familiar with them.

The defendant, by the sworn · map which is introduced, shows the extent of the claims of the two Boston companies; and judging from that, in comparison with the size of other claims spread thereon, they are quite extensive and cover a large territory, that of the Boston and Montana being, however, con-

siderably larger than that of the Butte and Boston. The map shows the interlacing, so to speak, of the different claims, and the importance of a consolidation of their rights, in order to avoid the complications arising out of the following of the veins outside of the limits of the original locations.

· With regard to values, the defendant mainly relies upon the fact that all these litigations—which really form the gravamen of the attack by the complainant upon the value to the several corporations of these properties—are perfectly well known to the public and to the stockholders; and that, notwithstanding their existence, not only have large dividends been made out of the actual earnings, but the confidence of the public in the value of the stocks has been maintained, as shown by the prices which they have commanded. And I may say here that there is not the least evidence in the cause indicating that the market for the stocks of these mines has been manipulated, or, to use the phrase of counsel, "rigged," for the purpose of maintaining them at an unnatural and forced price. It may be said, in general, that the price at which a stock sells on the market is not always an indication of its intrinsic value; yet the fact remains that the stock does command a certain price, and that persons who purchase stocks for the purpose of investment, as is sworn to here, do inquire, to a greater or less extent, into the intrinsic value of the stocks. Then we have the dividends actually paid. And against the assertion, unsupported by any affidavit on the part of the complainant, that one of the dividends, that of the Butte and Boston, was not paid out of the earnings, we have, on the other side, the affidavits of the officers of the company that the dividend was fairly and actually earned, and that the earnings have continued since the 1st of January at a rate greater than the dividends indicated by the previous year.

On the subject of the values of the Boston and Montana, I should mention that the affidavit of Mr. Bien, the counsel for the complainant here, shows that an action was instituted in the supreme court of New York by Forrest and MacGinnis, stockholders of the Boston and Montana company, against the Boston and Montana company, a corporation of Montana (whose stock

is proposed to be purchased), and against the Boston and Montana company, a New York corporation, and against Lewisohn Brothers, a New York corporation, and against the defendant herein, for an accounting, and asking for the appointment of a receiver of property which, it is claimed in that suit, was fraudulently diverted from the Montana corporation to the New York corporation. It appears by affidavits on the part of the defendant that the complainant in that action was verified on information and belief by Mr. Bien on April 30th, the very day on which he makes an affidavit for the complainant herein, and the allegation in the complaint in that suit is that the Boston and Montana company is a very rich company, earns large dividends, and that the property of the company is of the value of more than thirty million dollars.

Another action was brought against the defendant herein and other companies in the supreme court of New York, on or about April 29th, by MacGinnis and Lamm, in which the complaint was also verified by Mr. Bien, and in which the value of the properties owned by the Boston and Montana company is estimated at $60,000,000.

After a careful examination of all the affidavits and the map, I am clearly of opinion that it is quite impossible to say, upon the case made before me, that a valuation of the property of the Boston and Montana company of $56,000,000 would be excessive, or its purchase at that price imprudent.

The case of the Butte and Boston company presents more difficulty. The case shows that the mining engineers who made affidavits for complainant were entirely familiar with the extent of the mining claims of the Butte and Boston company, and the probable amount of mineral found under each claim, and might well have given a statement of the same, and their valuations of each claim, but have not done so. There is, however, as we have seen, one affidavit—that of Mr. Trerise—which values its property at only $1,500,000; but that affidavit, standing alone, for reasons already stated, produces little or no effect upon my mind. The defendant has not presented any statement of the value of the properties of the Butte and Boston, but relies upon the market value of its stock and the opinion of

Mr. King, and upon its earnings for the last year or two.  And it also relies upon the fact that the control of its stock would be of great value to the defendant for the purpose of preventing the clash of rights arising out of the Mining laws of the United States; and it is this which accounts for that portion of the affidavit of Mr. Rogers in which he says that he would not advise the defendant company to purchase the majority of the stock of either company unless he could have that of both. · And it may well be that the value of the stock of both companies to the defendant would be greater than is indicated by the value of either to be operated separately as independent properties.  It may well be that the defendant corporation, controlling, as it does, by the ownership of a majority of stock, substantially all the other mining claims at Butte, could afford to pay for the control of both the Butte and Boston and the Boston and Montana companies a sum which, in the aggregate, is greater than the value of either of those properties if they are to be operated as independent concerns.  And it must be observed that it is the value to the defendant corporation, the proposed vendee, which is to govern here, and not the value of their properties to the vendors.

It was urged by the defendant that the recent case of *Donald* v. *American Smelting and Refining Co., 48 Atl. Rep. 771, 786,* known as the *Smelting Case,* and which was almost precisely similar to the present, established the rule that the burden was on the complainant to show that the property proposed to be purchased was not worth the price to be given for it.  The language used by Mr. Justice Dixon, in speaking in that case for the court of errors and appeals, is as follows: "The defendants insist that the complainants have not borne the burden cast upon them by law, of proving that these items are not worth that sum; and certainly we would be unwilling now to adjudge that such a negative is established.  But it must be remembered that the cause is yet in a preliminary stage; that the complainants have shown the value of everything *which they could reasonably be expected to discover before instituting their suit;* that the directors are their trustees, and are intending a very large issue of stock for property which they have not seen fit hitherto to define.  Under

these circumstances, the legal rule imposing the burden of proof on the complainant should not be rigorously applied. Indeed, as these trustees are seeking to exercise a specially delegated power, which can be justly exercised only in accordance with a prescribed standard, it is not entirely clear that a burden does not rest, on them, when challenged beforehand, to vindicate their proposed action. But assuming the burden to be on the complainants, we think, for the present purposes, it is sustained."

There, it will be seen, the learned judge remarks upon the circumstance that the complainants have shown the value of everything which they could reasonably be expected to discover before instituting their suit, and that, under these circumstances, the legal rule of imposing the burden of proof upon the complainants should not be rigorously applied. There, as here, the complainants were stockholders of the purchasing company, but it did not appear, as I understand the language of the judge, that they had any special opportunities of ascertaining the value of the property to be sold.

In contrast with the circumstances of that case, the complainant here shows, by his engineers, that he was entirely familiar with all the property of the corporations the value of whose stock is in question. His bill and affidavits do not show any great disposition to display the details of his knowledge before the court, so as to enable the court to observe whether the opinions as to value are based on facts. He has relied, as I have observed, mainly upon the fact that the properties of the corporations are seriously in litigation. In the *Smelting Case* the property proposed to be purchased was one upon which a definite value could be placed. It consisted of a series of smelting plants, the cost of duplicating which could be shown with considerable accuracy. Here the property which creates the value of the stocks proposed to be purchased consists of mines in the ground, and no one but persons who had familiarized themselves with the property could judge of its value; and, at last, after thorough inspection, it is of uncertain value, owing to the fact that the veins may suddenly pinch out and come to an end, or may expand and prove to be of unexpected value. It is eminently a case where the value of the opinion of a witness as to value depends quite as

much upon his being disinterested as upon his having oppor-
tunities to judge. Upon the matter of mere opinion we have,
on one side, Mr. Trerise, who is shown to be substantially in
the employ of the complainant, and, on the other side, Mr. King,
who appears to be entirely disinterested and to have knowledge
of the mines in question equal to that of Mr. Trerise.

Upon the whole case, then, and without casting any great
burden of proof upon the complainant, I come to the conclusion
that he has failed to show such a lack of value as to induce
the court to continue the restraint.

I have dealt with the question of value in the first place, with-
out noticing the arguments of counsel on either side based on
other grounds.

The complainant puts his case on two grounds, which support
each other—*first,* the deficiency in value, and *second,* the fact
that three of the officers of the defendant corporation are also
officers of the Butte and Boston company, and are largely in-
terested, as stockholders, in both that company and the Boston
and Montana company, and therefore in a position to use their
influence with the directors, and, if necessary, with the stock-
holders of the defendant company, to bring about the purchase
and sale complained of. They do not, however, in support of
that notion, allege or prove that the officers in question are the
owners of a controlling or even very large interest in the de-
fendant corporation. But the fact that they are so interested
and so situated as probably to be able to exert an influence of
the kind mentioned, is a fact not to be ignored by the court.
The bill is based upon the idea that it is within the power of
the three gentleman named—Messrs. Rogers, Rockefeller and
Burrage—under the certificate of organization and the by-laws
of the defendant company, to, of themselves, without consulting
the stockholders or even the directors, complete the purchase by
a payment of cash. But the intention and ability to do this is
distinctly denied by the defendant, and its denial is supported
by the fact that it seems to be quite impracticable for the de-
fendant corporation to proceed and purchase all this property
by the payment of cash. They might, indeed, pledge the stocks
of the two Boston companies for a part of the purchase-price;

they might pledge some other property, and borrow the money for that purpose. But such a plan is not so feasible or so likely to be adopted as to seriously arrest the attention of the court. The plan proposed by the circulars of Kidder, Peabody & Company is to issue stock of the defendant corporation, and that cannot be done, under the statute, without a meeting of the stockholders; and all the parties interested deny that they intend to purchase except with the consent of the stockholders of the Amalgamated Copper Company.

Recognizing, then, the peculiar ability which the three directors now have to impress their views upon the stockholders of the defendant corporation, I cannot find in it a sufficient reason, in view of the conclusion I have come to as to values, to induce me to continue the restraint.

On the other hand, the defendant makes two points in addition to the one of value. One is that the suit is not prosecuted by the complainant in good faith for the preservation of his rights as a stockholder in the defendant company, but for the purpose of aiding the Heinze Brothers in their series of litigations with the corporations involved herein (and of this fact I am satisfied), and that this court ought, on general equitable principles, to refuse him relief. This position is supported by citations of authority of great weight, and has received respectful consideration, but I deem it unnecessary, in the conclusion I have reached as to value, to discuss at length the question or the authorities cited.

It is proper in this connection to say that of the $75,000,000 of stock, held by a great number of persons, only the complainant, with one hundred and four shares, and the C. H. Venner Company, with one hundred shares (purchased by it on May 2d, and who applied for leave and were permitted to come in as party complainant on May 3d), have come forward to ask for relief. The two hundred and four shares thus represented constitute but a small fraction of one per cent. of all the stock of the defendant; and the failure of any other stockholders to come forward indicates, as I have said, that they are not dissatisfied with the proposed purchase.

Another point made by the defendant is that the bill discloses

no contract made, and no real ground of belief that a contract will be made, and that the intention to make a contract without the consent of the stockholders is distinctly and positively denied, under the seal of the defendant company and the affidavit of its president, and is thereby entirely demolished; and counsel claim that the rule that where the allegations of the bill upon which the issuing of the injunction is based are completely denied by the answer the injunction will be dissolved, applies here. I feel constrained to say that the rule invoked is not of general application. Without stopping to examine the authorities in each case in which it has not been followed, to show that this case is not within it, it is, in my judgment, enough to say that there is enough disclosed in the pleadings and affidavits in this case to satisfy me that there is a danger that the plan proposed by Kidder, Peabody & Company will be carried through, but not without the consent of the majority of the stockholders of the defendant company.

I will advise that the order be discharged, with costs.